Hofstadter, J. P.
(dissenting in part.) I concur in the affirmance of the conviction but I dissent from the modification of the sentence. I would affirm without any qualification for I perceive no sufficient reason therefor.
• This court has been hearing appeals from the Criminal Court of the City of New York since September 1, 1962. Even Judges whose experience is exclusively in criminal cases often disagree in outlook. In view of the variant experience of the Justices of this court, it is not unnatural that we would differ in the disposition of criminal appeals, including the matter of sentences. Indeed, as Cabdozo tells us, ‘ ‘ in every court there are likely to be as many estimates # * * as there are judges on its bench,” and he concludes that u out of the attrition of diverse minds there is beaten something which has a * * * value greater than its component elements.”
But even when' we fail in unanimity, we do not falter in amiability. For, we share equally the common heritage of the Judaeo-Christian tradition of merciful concern for unfortunates, apotheosized in the appellation “ children of the children of mercy.” Indeed, we have been instructed that “ humaneness and compassion are worth as much as the fulfillment of all the other commandments.” (Tosefta, Peha IV, 18.)
A disparity in view of a sentence on appeal reflects, probably, that of the Judges who impose the sentences in the first instance. Milton G. Rector, Director of the National Council on Crime and Delinquency, refers to 1 ‘ the highly controversial problems of sentencing ” in this “ Foreword ” to the “ Model Sentencing Act” prepared by the Advisory Council of Judges of Mr. Rector’s group. He adds: “ The sentencing provisions of the penal law would have to be radically changed if we were to *257 solve the problems facing sentencing courts ”. And Judge Theodoke B. KAtudson of the District Court of Minnesota declares: “ Sentences have tended to vary materially between different judges because of their varying philosophies with respect to the seriousness of certain types or grades of crime. ’ ’[1] It is, inevitably, fraught with emotional overtones.
If, on occasion, therefore, I have seemed diffident to modify a sentence, it is because certain imponderables appeal strongly to me. In the interest of better understanding, it may be indicated to state them here at some length. It is my fond hope that my view will be understood even if not adopted.
There was no appellate review of sentences at common law.[2] Hence, it is not surprising that in the Federal judicial system, no appellate review of sentences as such obtains. Proposed Federal legislation provides for review only in sentences exceeding five years. Only 11 States provide for appellate review of sentences; the Empire State is among these. That there should be opportunity for review of sentences cannot be *258 gainsaid.[3] Since review is provided in matters of personal rights or property interests, there is no reason why it should be denied in the case of penal sanctions improperly imposed.
But the power so conferred on our appellate courts [4] is unique — as a departure from the norm. Its exercise, so instinct with grave responsibility, should be employed with great care. The imperative of judicial self-restraint seems especially controlling, and it is more readily attained by mindfulness of the distinction between power and right — a distinction which is a legal as well as moral one. Regard for law and order involves not only respect for authority, but also mindfulness of the lack of authority. In my view, it is right — lawful—because it is within its competence for the appellate court to review a sentence ; but it is not right — nor lawful —for it to revise a sentence merely because it might have decided differently at nisi prius had the appellate Judges been sitting there in judgment in the first instance.
To repudiate a disposition made below — within the discretionary limits set by the Legislature — in the exercise of the power of review, is not only an unjust condemnation of the action of the Judge who made it, but it also offends against the very nature of the appellate judicial process as I regard it.
Sentencing demands of a Judge the best he possesses in wisdom, experience and insight as a person as well as a minister of justice.[5] There can be no simple or rigid formula; the Legislature has wisely provided for discretion — and flexibility. To be sure, a Judge inevitably carries with him his social and other principles, rarely free from ‘[1] the empire of subconscious *259 loyalties.” But the appellate Judge no less than the Judge at nisi prius is also so burdened.
A sentence is not a mere incident of a trial and it is more than a sequel to it — it is “ the end for which the first was made ” — a component of a jurai process imbued with social significance of cosmic importance. If the world was fashioned in the Creator’s attribute of love, as Ancient Wisdom tells us, His providence provides for its rule by law — to insure its order. Dean Pound sums it up: “ Civilization involves subjection of force to reason, and the agency for this subjection is law.” The vehicle of the law should not be derailed unnecessarily.
Relatively equivalent cases should receive relatively equivalent treatment. It is equally important not to treat “unequal things equally;” as Samuel Butler observed: “Nothing is ever precisely like anything else.” Moreover, inequity is compounded when there is employed on appeal what has been termed a “hunch” system — an ad hoc rectification of what is considered hardship. We may and should urge a better system of meting out sentences, than now prevails — perhaps “ boards of sentencing ” or the like.[6] Until such innovation is established, I feel bound in duty to observe the rubrics of what I regard as salutary appellate practice — the guidelines for which are not wanting — even as I am bound in courtesy to honor contrary views.
Though we sometimes find it perplexing in their application, we know what the operative principles are. Judge Bebgan’s terse comment in Mann v. Hunt (283 App. Div. 140, 141) is a good point of departure: “The point of interference is not fixed in the caprice of judicial individualism ”. No revision is indicated unless there is ‘ ‘ definite and firm conviction that a *260 mistake has been, committed.” (United States v. United States Gypsum Co., 333 U. S. 364, 395); and an appellate court may-only upset a lower court ‘ ‘ reluctantly and only when well persuaded.” (United States v. Aluminum Co. of America, 148 F. 2d 416, 433.) Our own court has repeatedly said in civil cases before we passed on criminal appeals, also, that it will interfere with a determination below only when it is manifest that no reasonable man would so hold. It applies to sentences even more!
Unless, therefore, a sentence does violence to our sensibilities — unless “well persuaded” that a reasonable man could not have imposed it, I do not regard an appellate tribunal is free to intervene by revision. So long as the prevailing procedure remains the law — with discretion lodged in a Judge at nisi prius to fix punishment within flexible limits set by the Legislature— the appellate court should be loath to disturb his exercise of discretion. • For, if what Judge Jerome Frank termed “fact-skepticism” is not precisely applicable, “self-skepticism ” is apposite; appellate review will find a safe guide in such a mood.
We must cling to the guidelines by which our society lives if the quality of mercy is not to be unduly strained by failing to hold a hard core of intelligibility. If the impulse to compassion is not channeled in the paths of principle, it becomes an excursus in subjectivism — “judicial impressionism” it has been called by the legal philosopher, deny — it lacks “ the quality of educated mercy. ’ ’[7]
In this view, an unduly lenient Judge may not be a truly merciful one. Whether judged by a standard of procedural regularity in the exercise of appellate authority, of juridical pragmatism, or from the high vantage point of ethical impera *261 tive, an unwarranted modification of sentences is inadmissible. It results in what Chief Justice Hughes called in another context, “ self-inflicted wounds ” on the court. To adapt the summation of another great Judge, such a disposition “is neither good morals, good science nor good law” (“Law as Literature ”— Harcourt Brace, New York, 1931 — Cardozo).
We of the Western tradition who accept the boon of free will for ourselves must, when called on to do so, accept the burden, too, of adequately assessing the guilt of others, especially in a time when there seems to be an organized assault on our way of life. In order that law, which embodies the ethos of our society, remain effective, its judgments may not lapse into facile oversimplification. To be pragmatically, as well as morally, sound, judicial action generally, and a disposition in a criminal ease, in particular, must reflect the essential nature of the community — its culture, its norms and its ideals.
This does not exclude leniency in a proper case within prescribed authority. But though the divine impulse in action is a constant, the impulse to mercy will vary with individuals because, like other human qualities, however exalted, it is enacted by mortal faculty. As in every other natural phenomenon, then, it must conform to the law of causality. In the law, this is ordered reason.
In the instant case, I do not discern adequate reason for repudiating the action of the court below. I am, therefore, constrained to vote for affirmance without qualification.
Gold, J., concurs with Tilzer, J.; Hofstadter, J. P., dissents in part in opinion.
Judgment modified, etc.

. National Conference of State Judges at San Francisco, August 1962. James V. Bennett, the Federal Director of Prisons, offers an almost incredible instance of disparity in sentences. A pair of embezzlers were convicted in adjoining courtrooms, during the same week, in the same courthouse. One was given 30 days and the other was given 15 years! (“ Count Down for Judicial Sentencing^,” 28 J. Bar Assn, of D. D., 420, 424 [I960]).
A lively controversy now agitating legal circles in Kentucky highlights an additional factor complicating the problem of disparate sentences. This is one of the States (about one third in all) where sentencing by the juries obtains in felony eases. Advocating a change in the Rules of Criminal Procedure to provide that this function be confided to Circuit Court Judges, Judge John S. Palmore — in a recent article in the University of Kentucky Review of Government — stressed that juries did not know what other juries had done in similar eases: “ Hence, it is not unusual for one burglar to receive a sentence of two years and his accomplice, tried in the same court, by another jury, to be sentenced to five years or more. As between different courts in different localities the disparity is even more aggravated. For example, in many Kentucky communities no jury has ever given the death penalty in any case, while in others it is a common occurrence.” {New York Times — Sept. 22, 1963.)
“ When, as is often the ease, there are disparities of sentence, the need for a remedy by way of review or appeal is particularly urgent. Disparities, whether real or apparent, create prison disciplinary problems and in many cases tend to defeat one of the purposes of sentence — the rehabilitation of the defendant as a useful member of society” (“The Administration of Criminal Justice” by Chief Judge J. Edward Lumbard — A. B. A. Journal, September, 1963). See Footnote “ 6” infra.

. See “Appellate Review of Sentences — A Symposium Etc.,” 32 F. D. R. 249-321; United States v. Soblen, 301 F. 2d 236, 243 (2d Cir. 1962); and cases cited in United States v. Rosenberg, 195 F. 2d 604; 109 U. Pa. L. Rev. 422 n. 5, 423 n. 8 (1961). “ Appellate Review of Primary Sentencing Decisions: A Connecticut Case Study,” 69 Yale L. J. 1453 (1960).

. Such nonreview at common law doubtless was an aspect of the “ bloodiest code in Europe ” — a code which held a roster of several hundred capital offenses and spawned the amoral rule of the admissibility of illegally secured evidence. It is to be regretted that the tenacious, vestigial remains of Before have survived Mapp and Ker (see People v. Binan, 11 1ST Y 2d 350). The “bloodiest code” was itself part of an “English past . . . full of excess, punitive laws . . . [and] lawlessness” (See “England and America; Climates of Tolerance and Intolerance —1962” by Herbert J. Hyman).

. N. Y. Const., art. VI, § 5; Code Grim. Pro., § 543. Since 1907 the English Court of Criminal Appeal has also exercised a power to reduce — as well as to increase — !or change the type of punishment imposed.

. See “ Foreword ” by Judge Bolitha J. Laws in “ Guides for Sentencing.”
In an article “ Sentencing: The Judge’s Problem ” — Atlantic Monthly, Jan., 1960 —Judge Irving Kaufman says: “If the hundreds of American Judges who sit on criminal cases were polled as to what was the most trying facet of their jobs, the vast majority would certainly answer ‘ Sentencing.’ In no other judicial function is the judge more alone; no other act of his carries greater potentialities for good or evil than the determination of how society will treat its transgressors.” I

. For a long time, there have been recurrent suggestions that — at least in certain eases — trials be limited to the factum of the commission of the criminal act and that the disposition of the defendant be relegated to commissions— r one sort or another, in composition. In “A Monograph on Mental Unsoundness,” Francis Wharton — the pioneer penologist — made such a suggestion 100 years ago. Like proposals have been made since. See “ Glueck, Report at the Ninth International Prison Congress, Mental Hygiene No. 1;” “ Insanity and Criminal Responsibility — Report of Committee of the Institute ” —10 J. Grim. L. and Crime, 184. In 1928, Governor Smith requested the Legislature to enact such a program. Recently, a British student of criminal procedure, in an article in “ The Listener ” declared that the Trial Judge is, generally, not equipped to handle sentencing and suggests that this matter be placed in the hands of an administrative board composed of a Judge, a Magistrate, a police official, a psychiatrist and a social worker. (See Footnote “1” supra.)

. See -Judge Murtagh’s excellent review of " Beyond the Law,” by James A. Pike (Saturday Review — Aug. 7, 1963). The concept of “ educated justice ” was adumbrated in the scriptural injunction: Justice, justice shalt thou pursue. The categorical imperative enshrined in this directive is that just ends must be secured only by just means. Thus, the Judaeo-Christian tradition absolutely rejects the amoral and corrosive doctrine that the end justifies the means — any means. “ Due process ” is the legal imperative based on such ethical predicate. The community’s equal right to “ due process ” entails no diminution of the defendant’s rights. As the Court of Appeals said in People v. Waterman (9 N 7 2d 561, 564) : “ The problem is that of achieving a balance between the competing interests of society in the protection of cherished individual rights, on the one hand, and in effective law enforcement and investigation of crime, on the other.” It is a fair implication, I think, that when a mild penal sanction has been imposed, well within the discretionary limits fixed by legislative authority, it should not be disturbed when it is agreed that the conviction was justly founded.